UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA RHODES, et al.,

        Plaintiffs,                                 Case No. 17-cv-14186
vs.                                               HON. MARK A. GOLDSMITH

RICHARD D. SNYDER,

        Defendant.
_____/

## OPINION & ORDER
## DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (Dkt. 8)

      Plaintiffs ask that this Court order Defendant Governor Richard Snyder to hold the election to fill out the balance of Congressman John Conyers Jr.'s term on an earlier schedule than the one the Governor established. The United States Constitution requires a state's governor to call an election to fill vacancies in that state's representation in the United States House of Representatives, thereby ensuring that its "[m]embers [are] chosen . . . by the People of the several States." U.S. Const. art. I, § 2, cl. 1. But the Constitution accords considerable deference to a governor in setting the election date. Having reviewed the extensive record presented, this Court finds no evidence supporting Plaintiffs' theory that Governor Snyder was racially motivated or otherwise violated equal protection guarantees when he established dates that coincide with the regularly scheduled election dates in August and November of this year. Therefore, those dates will remain in effect.

### I. BACKGROUND

      This matter is before the Court on a motion for preliminary injunction (Dkt. 8) brought by Plaintiffs Debra Rhodes, Gloria Mounger, Thomas Williams, Laura Dennis, and Vivian

1

Wordlaw. Plaintiffs are registered voters in Michigan's thirteenth Congressional district, a district that has been without a representative in the U.S. House of Representatives since the resignation of Congressman Conyers on December 5, 2017. Plaintiffs allege that Governor Snyder's decision to delay a special election until November 6, 2018, violates their equal protection, due process, and voting rights under the Michigan and United States constitutions. They now seek an order directing Governor Snyder to conduct a special election "as soon as possible." For the reasons stated below, the Court denies Plaintiffs' motion for preliminary injunction.

On December 5, 2017, Congressman Conyers resigned as Representative of Michigan's thirteenth Congressional district. Am. Compl. ¶ 20 (Dkt. 10). Three days later, Governor Snyder called a special election to fill the vacant House seat. Id. ¶ 22. Governor Snyder stated that the primary election would be held on August 7, 2018, while the general election would be held on November 6, 2018; these dates correspond with the previously scheduled dates for the primary and general elections for the 2018 state-wide races and congressional seats. See Conyers Election Call, Ex. 4 to Def. Resp., at 1-2 (Dkt. 11-5). The winner of this special election will serve out the remainder of Congressman Conyers's term, a period running from November 7, 2018 until January 3, 2019.

Plaintiffs allege that this eleven-month delay between Congressman Conyers's resignation and the special general election, in a majority-black district, violates the Fourteenth Amendment's due process and equal protection clauses, and the corresponding provisions of the Michigan Constitution. They also allege that this delay violates their right to vote under the Fifteenth Amendment. Plaintiffs contrast the eleven-month delay with the four-month delay that occurred when there was a vacancy in 2012 in Michigan's eleventh congressional district, a

majority-white district. They argue that the loss of the constitutional right to vote tips the balance of harms in their favor; they also contend that a prompt special election is in the public interest.

In response, Governor Snyder first argues that Plaintiffs' claims are barred by the equitable doctrine of laches, because Plaintiffs waited nearly two months after Congressman Conyers' resignation to file a motion for preliminary injunction. He also argues that Plaintiffs' claims fail on the merits, because other congressional districts have been treated in a similar manner when vacancies have arisen, and because the decision to fill the vacancy using the previously scheduled primary and general elections dates does not unconstitutionally burden their right to vote. With regard to the balance of harms, Governor Snyder argues that Plaintiffs do not have a right to continuous, uninterrupted representation, and that an order compelling an earlier election that does not coincide with other regularly scheduled elections would impose significant costs and burden government employees. Finally, Governor Snyder argues that the public interest does not weigh in favor of holding an earlier special election, asserting that as long as the state complies with the constitutional requirement that a special election be held, the public does not have any particular interest in when the election is held.

The Court held a hearing on Plaintiffs' motion on March 15, 2018. It was at this hearing that Plaintiffs' counsel first specified the relief that Plaintiffs seek. While the motion merely states that Plaintiffs ask that the special election be held "as soon as possible," Plaintiffs' counsel stated at the hearing that Plaintiffs are seeking a special, standalone primary to be held within fifty days, with the special general election to be held at the same time as the regularly scheduled primaries on August 7, 2018.

After hearing this proposal, the Court called Melissa Malerman, a senior election law specialist with Michigan's Secretary of State, to testify as to its feasibility. Malerman testified that the requested fifty-day deadline to hold a standalone special primary was not possible. In a subsequent declaration, Malerman states that, under Plaintiffs' proposal, it is not possible to meet the forty-five-day deadline for issuing ballots overseas voters, as required by the Uniformed and Overseas Civilian Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301, et seq., without violating several state statutes. Malerman Aff. II, Ex. 1 to Supp. Br., ¶ 12 (Dkt. 18-2). These include allowing time for individuals to challenge nominating petitions and to file administrative appeals, Mich. Comp. Laws § 168.552(2), and allowing candidates two business days to review ballot proofs for completeness and accuracy, Mich. Comp. Laws § 168.565. Id.

Malerman also addressed the possibility of holding a standalone primary in June, stating that compliance with certain statutory deadlines would be "extremely complicated and fraught with the potential for error, or impossible." Malerman Aff. II ¶ 14. Scheduling a primary on June 5, 2018 would shorten the statutory deadline for candidates to file in order to ensure compliance with the UOCAVA. Id. Mandating a June 12, 2018 primary would eliminate the ability to file a challenge against the sufficiency of a candidate's nominating petition. Id. A June 19, 2018 primary would violate the statutory deadline to certify candidates to the August ballot. Id. Finally, holding a June 26, 2018 would force Michigan to violate the UOCAVA. Id.

Malerman believes that, ideally, the state would need at least ninety days to comply with statutory requirements, including allowing candidates to collect signatures, allow individuals to challenge those signatures, and certifying and printing ballots. According to Malerman, even if the standalone primary was held ninety days from now, there would still be a possibility that certain statutory deadlines would be violated. However, she acknowledged that the state was

able to schedule and conduct a standalone primary in September 2012, less than two months after a vacancy occurred in Michigan's eleventh congressional district.

## II. STANDARD OF DECISION

To determine whether to grant a preliminary injunction, a district court must consider: (i) the plaintiff's likelihood of success on the merits; (ii) whether the plaintiff may suffer irreparable harm absent the injunction; (iii) whether granting the injunction will cause substantial harm to others; and (iv) the impact of its decision on the public interest. Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224, 230 (6th Cir. 2003). These four factors "are factors to be balanced, not prerequisites that must be met." Id.

## III. ANALYSIS

In their amended complaint, Plaintiffs allege violations of their due process, equal protection, and voting rights. However, in their motion for preliminary injunction, Plaintiffs only address the merits of their equal protection claim. As a result, the Court will only consider whether the decision to delay the special election until November violates Plaintiffs' equal protection rights. Prior to consideration of this claim, the Court addresses an equitable defense raised by Governor Snyder.

### A. Likelihood of Success on the Merits

#### 1. Laches

Governor Snyder first argues that Plaintiffs are unlikely to prevail on the merits because their claims are barred by the doctrine of laches. "Where a plaintiff seeks solely equitable relief, his action may be barred by the equitable defense of laches if (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant was prejudiced by this delay." Am. Civil Liberties Union of Ohio, Inc. v. Taft, 385 F.3d 641, 647 (6th Cir. 2004). An examination

of Sixth Circuit case law leads to the conclusion that Plaintiffs unreasonably delayed in asserting their rights. In Kay v. Austin, 621 F.2d 809 (6th Cir. 1980), the court held that the plaintiff's suit, in which he sought to be named on the presidential primary ballot, was barred by laches because he waited until twenty-five days after he knew the candidates had been chosen to file suit. Id. at 813; contrast with Taft, 385 F.3d at 647 (finding no unreasonable delay where the plaintiffs waited eleven days to file suit). Here, Plaintiffs filed suit on December 27, 2017, nineteen days after Governor Snyder announced that the general election would not be held until November 6, 2018. See Compl. (Dkt. 1); Conyers Election Call at 1-2. While it is questionable whether this delay, standing alone, was unreasonable, Plaintiffs weakened their position by waiting until February 2, 2018 to file the instant motion for preliminary injunction. Typically, in an election matter, a motion for preliminary relief is filed simultaneously with the filing of the complaint or shortly thereafter. Here, Plaintiffs inexplicably waited over five weeks after initiating this action to move for relief. As a result, the Court concludes that Plaintiffs unreasonably delayed in prosecuting this action.

Despite this delay, it does not appear that the state has been prejudiced. In Kay, the court found the action to be barred by laches where the state had already incurred significant costs in preparation for the election at the time the plaintiff filed suit. Kay, 621 F.2d at 813. In Taft, the court held that there was no prejudice because "there is no evidence that Governor Taft had expended money or made alternate preparations during the delay." Taft, 385 F.3d at 647. Similarly, there is no evidence in the record that the state has already expended money in preparation for the August primaries and the November general election. While there is evidence that altering the dates will cause municipalities to incur costs that they otherwise would
6

not, Governor Snyder has not shown that any costs have already been incurred as a result of Plaintiffs' delay. Plaintiffs' action is, therefore, not barred by laches.

**2. Equal Protection**

The Court next turns to the merits of Plaintiffs' equal protection claim. They allege that Governor Snyder has violated their equal protection rights because the decision to delay the special election was racially motivated and burdened their fundamental right to vote. The Court disagrees on both counts.

Article I of the Constitution addresses how vacancies in the House of Representatives are to be filled: "When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Elections to fill such Vacancies." U.S. Const. art. I, § 2, cl. 4. Article I, Section four, Clause one makes clear that states are responsible for administering the election of senators and representatives, providing that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Place of chusing [sic] Senators." Congress subsequently passed a law stating that "[t]he time for holding elections in any State, District, or Territory for a Representative or Delegate to fill a vacancy, whether such vacancy is caused by a failure to elect at the time prescribed by law, or by the death, resignation, or incapacity of a person elected, may be prescribed by the laws of the several States and Territories respectively." 2 U.S.C. § 8. In Taft, the Sixth Circuit ruled that Article I imposes a "mandatory duty" upon the governor of the state where the House vacancy occurs to hold a special election. Taft, 385 F.3d at 650.

In accordance with this mandate, Michigan has established a mechanism through which the governor is to call a special election in the event of a vacancy. Mich. Comp. Laws § 168.633 states:

> The governor shall call a special election in any congressional district of the state when the right of office of a person elected representative in congress shall cease before the commencement of the term of service for which he shall have been elected, or whenever a vacancy shall occur in the office of representative in congress after the term of service has begun for which such representative was elected; or the governor shall direct that such vacancy shall be filled at the next general election to be held at least 30 days after such vacancy shall occur.

This statute provides broad discretion to the governor. It does not contain any particular requirement regarding when the special election is to be held; it only mandates that the governor "shall call a special election" when a vacancy occurs. Relevant here, the statute expressly allows the governor to schedule the special election "at the next general election," provided that the general election is held at least thirty days after the vacancy occurs.

It is clear that Governor Snyder is complying with statutory language. He has chosen to hold the special election on the same day as the next general election; because the next general election will occur more than thirty days after the House seat became vacant, he is within his rights under the statute. Plaintiffs concede this point, and instead argue that Governor Snyder engaged in "discriminatory application" of this law when he scheduled a special election eleven months after the vacancy occurred, in violation of their rights under the Equal Protection Clause.

A review of the briefing indicates two distinct theories for relief under the Equal Protection Clause: (i) Governor Snyder chose to delay the special election for eleven months on the basis of race; and (ii) he has deprived constituents of the thirteenth district their fundamental right to vote and to representation by leaving their congressional seat vacant for eleven months.

8

With regard to the racial discrimination theory, Plaintiffs argue that discrimination can be inferred by comparing Governor Snyder's actions in this case with his actions following the vacancy in Michigan's eleventh congressional district in 2012. On July 8, 2012, Thaddeus McCotter, then the Representative of Michigan's eleventh congressional district, announced that he was resigning his seat in the House. On July 10, 2018, Governor Snyder announced that he was calling a special primary election for September 5, 2012; this primary was the only election held on that date. See McCotter Election Call, Ex. 6 to Def. Resp., at 1-2 (Dkt. 11-7). Governor Snyder also announced that the special general election would be held on November 6, 2012, the same date as the previously-scheduled presidential and congressional races. Id. at 2. Plaintiffs argue that this short, four-month delay between the call and the election in a majority-white district demonstrates that Governor Snyder is racially discriminating against the majority-black thirteenth district, where citizens are forced to wait eleven months for a special general election.

The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination by the government that "burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." Loesel v. City of Frankenmuth, 692 F.3d 452, 461 (6th Cir. 2012) (quoting Rondigo, L.L.C. v. Twp. of Richmond, 641 F.3d 673, 681–682 (6th Cir. 2011)). While Plaintiffs argue that discrimination can be proven by disparate impact, it is well-settled that the Equal Protection Clause prohibits only intentional discrimination. Washington v. Davis, 426 U.S. 229, 239 (1976). To establish intentional discrimination, a showing must be made that the state official acted with the purpose of creating an adverse impact on an identifiable group — not simply with an awareness that adverse consequences would result from the state action:

> "Discriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences. It implies that the

9

> decisionmaker . . . selected or reaffirmed a course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

Pers. Admin'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979).

The burden of demonstrating purposeful discrimination "is a heavy one to satisfy," Sampson v. Town of Salisbury, 441 F. Supp. 2d 271, 279 (D. Mass. 2006), and requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," Rogers v. Lodge, 458 U.S. 613, 618 (1982). Without the proverbial "smoking gun of an overtly discriminatory statement by a decisionmaker, it may be very difficult to offer sufficient proof of" discriminatory purpose. Soto v. Flores, 103 F.3d 1056, 1067 (1st Cir. 1997).

Plaintiffs proffer Governor Snyder's actions in the eleventh district as circumstantial evidence of discrimination, but this argument is not compelling. Both the similarities and differences between Governor Snyder's actions here and in the eleventh district weigh in his favor. Starting with the differences, the vacancy in the eleventh district occurred in July of an election year, while the vacancy here occurred in the December prior to the election year. Thus, it cannot be said that Plaintiffs are similarly situated with those in eleventh district in 2012.

While Plaintiffs note the difference in the time that Governor Snyder allowed each seat to remain vacant, this is by virtue of Governor Snyder's clear preference to hold special elections in conjunction with previously-scheduled elections. In both the present case and in the case of the eleventh district, Governor Snyder chose to hold the special general election at the same time as the regularly scheduled November elections. Although he scheduled a standalone special primary in September 2012 for the eleventh district, this was due to the State's inability to prepare for the August primaries following McCotter's abrupt July resignation. See Malerman Aff. II ¶ 28. In nearly every other vacancy brought to the Court's attention, the evidence shows

that Governor Snyder has scheduled one or both of the special primary and special general elections at the same time as previously-scheduled elections. See Ananich Election Call, Ex. 8 to Def. Resp., (Dkt. 11-9) (special primary and general); Courser Election Call, Ex. 9 to Def. Resp., at 1-2 (Dkt. 11-10) (special primary); Gamrat Election Call, Ex. 9 to Def. Resp, at 3-4 (Dkt. 11-10) (special primary); Dillon Election Call, Ex. 9 to Def. Resp., at 5-6 (Dkt. 11-10) (special primary); Banks Election Call, Ex. 10 to Def. Resp. at 1-2 (Dkt. 11-10) (special primary and general); Kivela Election Call, Ex. 10 to Def. Resp., at 3-4 (special primary and general); Schor Election Call, Ex. 11 to Def. Resp., (special primary and general).[1] Plaintiffs cannot demonstrate that Governor Snyder had a racially discriminatory purpose when he delayed the special primary and general elections for the thirteenth district.

In addition to their racial discrimination theory, Plaintiffs set forth a second theory for relief under the Equal Protection Clause. Plaintiffs contend that, regardless of race, Governor Snyder's decision to hold the special general election eleven months after the House vacancy occurred violates their equal protection rights by burdening their fundamental right to vote. As noted above, an equal protection claim will lie where a plaintiff has shown that the defendant has burdened a fundamental right. Loesel, 692 F.3d at 461. It is well-settled, and the parties do not dispute, that the right to vote is a fundamental right. See McDonald v. Bd. of Election Comm'rs of Chicago, 394 U.S. 802, 807 (1969). The dispute turns on whether delaying the special general election eleven months actually constitutes a burden on Plaintiffs' voting rights.

---

[1] Plaintiffs note one exception to this rule. In 2013, Governor Snyder called a standalone primary and a standalone general election to fill the seat of state Senator John Gleason. See Gleason Election Call at 2 (Dkt. 16). At the hearing, counsel for Governor Snyder stated that the governor ceased this practice after receiving significant criticism from constituents in Senator Gleason's district. The Court believes that this one exception does not contradict Governor Snyder's clear preference to coordinate special elections with regularly scheduled elections.

As discussed above, the Sixth Circuit in Taft held that governors are under a constitutional obligation to call an election to fill a vacancy in the House. Taft, 385 F.3d at 650. However, the court also recognized that the Constitution "gives states the discretion to determine the 'Times, Places, and Manner' of holding such elections, and that the states have valid interests in ensuring fair and reliable elections." Id. at 650-651 (quoting U.S. Const., art. I, § 4, cl. 1). The court held that "legislative balancing between a state's interests in ensuring fair and reliable elections, and its citizens' rights to vote and to equal representation, is entitled to considerable deference." Id. at 651.

Other courts that have addressed delays in filling House vacancies have also recognized the discretion afforded to states when scheduling special elections, and the deference that courts should afford states in balancing their interest in ensuring fair elections against its citizens' right to vote and to representation. In Jackson v. Ogilvie, 426 F.2d 1333 (7th Cir. 1970), voters brought suit after the governor of Illinois refused to call a special election after the death of a House member on August 13, 1969. In a May 1970 opinion overturning the district court's dismissal, the Seventh Circuit held that the governor had a mandatory, constitutional duty to call a special election to fill the vacant House seat. Importantly, the court also stated that a governor "has discretion in calling a special election," noting that "he may prefer one day of the week over another, <u>or cause the special election to coincide with or to avoid being held on the same day as another election</u>." Id. at 1337-1338 (emphasis added). The court held that the district court's order "should be framed in a manner which will preserve defendant's latitude and discretion in these matters." Id. at 1338. Also of note, the Seventh Circuit stated that the special election could coincide with the regularly scheduled November 3, 1970 elections, and came to the conclusion that a truncated term from November 1970 through January 3, 1971 was not

12

insignificant. Id. at 1337 ("We are not prepared to say as a matter of law that representation from the time the results of the November 3 election will be determined to January 3, 1971 is de minimis.").

In Mason v. Casey, No. CIV. A. 91-5728, 1991 WL 185243 (E.D. Pa. Sept. 18, 1991), the court rejected a claim by Pennsylvania voters that a statute requiring at least sixty days between a vacancy and special election deprived them of their right to vote. The vacancy occurred on September 11, 1991, and because of the statute, the special election could not be held to coincide with the November 5, 1991 general election. In denying relief, the court stated that "Plaintiffs [sic] claim of infringement of a fundamental right is based upon when the election should take place, and that determination is clearly within the wide discretion of the Pennsylvania Legislature and Governor Casey." Id. at *2. The court held that "[i]t is clear that many factors must be considered in deciding the issue of when an election for a vacancy should take place, and these factors are peculiarly within the discretion of the state. Pursuant to 25 P.S. § 2777, November 5, 1991 is not a viable date for the election, and this decision is constitutional as long as the resulting delay serves a legitimate purpose." Id. The court found that the delay served a legitimate purpose because it allowed time to educate voters on the issues and candidates that would be on the ballot. Id.

The court in Fox v. Paterson, 715 F. Supp. 2d 431, 437 (W.D.N.Y. 2010) also recognized that "the Framers of the Constitution and Congress have clearly indicated their intent to leave decisions concerning the timing of such elections to the individual states." In Fox, voters in New York challenged the governor's decision to wait until November 2010 to hold a special election after a vacancy occurred in March of that year. The court found that the governor acted within his discretion when delaying the election until November, noting that he articulated several

13

reasons for the delay, including the use of new electronic voting machines, the financial burden that would be placed upon municipalities by holding a special election so close to the general election, and the possible disenfranchisement of military voters stationed overseas. Id. at 440.

The Court holds that, like the governors in Mason and Fox, Governor Snyder has acted within the discretion conferred upon him by the Constitution. He has set forth several legitimate reasons for his decision to hold the special primary and general elections in conjunction with previously-scheduled elections. These reasons include: (i) allowing time for candidates to raise money, collect signatures, and educate voters; (ii) allowing the state's normal primary and general election process to occur; and (iii) the cost in conducting special elections. Def. Resp. at 17; see also 12/8/2017 Press Release, Ex. 2 to Def. Resp. (Dkt. 11-3) ("Having ample time for candidates to make a decision about running for office and file their paperwork gives people more options as to who will next represent them in Congress. In order to allow several months for that to take place and to reduce the financial burden on local taxpayers, the primary and general elections will be held when regularly scheduled elections are already occurring.").

In support of his assertion that delaying the special election will lessen the burden on local communities, Governor Snyder offers the affidavits of Malerman, the senior election law specialist with Michigan's Secretary of State. Malerman explains in detail the preparations that are necessary to hold an election in the thirteenth congressional district. These preparations include receiving and canvassing nominating and qualifying petitioners, resolving challenges against those petitions, preparing and distributing ballots, appointing and training election inspectors, processing registration and ballot applications, testing voting equipment, posting public notice of deadlines, and preparing and distributing election day equipment and materials. Malerman Aff., Ex. 3 to Def. Resp., ¶ 6(a)-(n) (Dkt. 11-4). According to Malerman, "the total

estimated cost to conduct a special primary or special election on a day other than a regular election date in the 13th Congressional District is $840,000." Id. ¶ 10. The majority of this additional amount, over $500,000, would be incurred by the City of Detroit if either the special primary or special general election were required to be held on a date other than a previously-scheduled election. Id.

Governor Snyder acted within the discretion granted to him when he considered the amount of time it takes state election officials to prepare for an election, the financial burden standalone elections place on municipalities, and the time it takes for candidates to collect signatures and educate voters, and determined that holding the special primary and special general election in conjunction with the regularly scheduled elections was the best course of action. Courts have made clear that while states are under an obligation to conduct a special election when a congressional vacancy occurs, they are given broad discretion in determining when the special election should be held. As long as a state balances its "interests in ensuring fair and reliable elections, and its citizens rights to vote and to equal representation," the decision regarding when to schedule a special election "is entitled to considerable deference." Taft, 385 F.3d at 650; see also Mason, 1991 WL 185243 at *2 (a delay in scheduling a special election is permissible as long as the delay "serves a legitimate purpose."). Because the record reflects that the delay serves legitimate purposes, it cannot be said that Snyder has burdened Plaintiffs' fundamental right to vote.[2]

---

[2] This conclusion is bolstered in light of Plaintiffs' newly sought relief. Instead of requesting that Governor Snyder hold a special election "as soon as possible," Plaintiffs now indicate that they would be amenable to an August special election, preceded by a standalone special primary. This would effectively add three months to the term of the successor, compared to the term that would be served under the timetable established by Governor Snyder. While the Court is cognizant of the importance of the right to representation, it does not find Governor Snyder's decision to hold the special election just three months later than requested to be constitutionally

The Court recognizes that a period of eleven months without representation is significant. In certain instances, a governor's decision to delay a special election for "an extraordinary amount of time" may constitute "a de facto refusal to call a special election at all." Fox, 715 F. Supp. 2d at 442. For instance, if Congressman Conyers had resigned immediately after his term began in January 2017, the Court would be hard pressed to defer to the Governor's decision to hold a special election in November 2018; that would likely be a "de facto refusal to call a special election at all." But that is not the case here. While Governor Snyder could have theoretically scheduled one or two standalone elections immediately after Congressman Conyers resigned in December, he was entitled to consider, and reject, the burdens that such a decision would impose on the localities and candidates. His decision to hold the special elections in conjunction with previously-scheduled elections is constitutionally permissible. Therefore, Plaintiffs have not demonstrated a likelihood of success on the merits.

**B. Irreparable Harm, Potential Injuries to Others, and the Public Interest**

While no single factor controls, "a finding that there is simply no likelihood of success on the merits is usually fatal." Gonzales v. Nat'l Bd. of Med. Examiners, 225 F.3d 620, 625 (6th Cir. 2000). In light of Plaintiffs' failure to demonstrate a likelihood of success on the merits, the Court will briefly address the remaining factors. With regard to irreparable harm, "a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." Overstreet v. Lexington-Fayette Urban Cty.

---

infirm. This is especially so where holding a special general election in conjunction with a regularly-scheduled primary is likely to cause confusion to voters. See Malerman Aff. II ¶ 24 (noting that Michigan law requires primary voters to only vote for one party, which may cause confusion for general election voters who are not so restricted). The timing of Plaintiffs' proposal, raised for the first time at the March 15, 2018 hearing, also makes earlier elections impractical, if not entirely impossible. See id. ¶¶ 9-15.

Gov't, 305 F.3d 566, 578 (6th Cir. 2002). Because Plaintiffs have not made out a violation of their constitutional rights, they cannot demonstrate that they would suffer irreparable harm in the absence of an injunction. The remaining factors, "harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). The Court holds that these factors weigh in favor of Governor Snyder. As discussed above, ordering a standalone special election, in addition to burdening municipalities and potential candidates, could cause the state to run afoul of several state and federal statutory requirements. In sum, the remaining preliminary injunction factors weigh in Governor Snyder's favor.

## IV. CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' motion for preliminary injunction (Dkt. 8).

SO ORDERED.

Dated: March 28, 2018  
    Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 28, 2018.

s/Karri Sandusky  
Case Manager